**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| SAMANTHA JENKINS, EDWARD BROWN, KEILEE FANT, BYEON WELLS, MELDON MOFFIT, ALLISON NELSON, HERBERT NELSON JR., TONYA DEBERRY, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>THE CITY OF JENNINGS )<br><br>Defendant. ) | Case No. _____<br><br>(Jury Trial Demanded) |

## CLASS ACTION COMPLAINT

### Introduction

1.      The Plaintiffs in this case are each impoverished people who were jailed by the City of Jennings because they were unable to pay a debt owed to the City from traffic tickets or other minor offenses.  In each case, the City imprisoned a human being solely because the person could not afford to make a monetary payment.  Although the Plaintiffs pleaded that they were unable to pay due to their poverty, each was kept in jail indefinitely and none was afforded a lawyer or the inquiry into their ability to pay that the United States Constitution requires.  Instead, they were threatened, abused, and left to languish in confinement at the mercy of local officials until their frightened family members could produce enough cash to buy their freedom or until City jail officials decided, days or weeks later, to let them out for free.

2.      Once locked in the Jennings jail, impoverished people owing debts to the City endure grotesque treatment.  They are kept in overcrowded cells; they are denied toothbrushes,

toothpaste, and soap; they are subjected to the stench of excrement and refuse in their congested cells; they are surrounded by walls smeared with mucus, blood, and feces; they are kept in the same clothes for days and weeks without access to laundry or clean undergarments; they step on top of other inmates, whose bodies cover nearly the entire uncleaned cell floor, in order to access a single shared toilet that the City does not clean; they huddle in cold temperatures with a single thin blanket even as they beg guards for warm blankets; they develop untreated illnesses and infections in open wounds that spread to other inmates; they sleep next to a shower space overgrown with mold and slimy debris; they endure days and weeks without being allowed to use the shower; women are not given adequate hygiene products for menstruation, and the lack of trash removal has on occasion forced women to leave bloody napkins in full view on the cell floor where inmates sleep; they are routinely denied vital medical care and prescription medication, even when their families beg to be allowed to bring medication to the jail; they are provided food so insufficient and lacking in nutrition that inmates are forced to compete to perform demeaning janitorial labor for extra food rations and exercise; and they must listen to the screams of other inmates being beaten or tased or in shrieking pain from unattended medical issues as they sit in their cells without access to books, legal materials, television, or natural light.  Perhaps worst of all, they do not know when they will be allowed to leave.

3.      In each of the past two years, inmates have committed suicide in the Jennings jail after being confined there solely because they did not have enough money to buy their freedom. Others have attempted to take their own lives under similar conditions.

4.      These physical abuses and deprivations are accompanied by other pervasive humiliations.  Jennings jail guards routinely taunt impoverished people when they are unable to pay for their release, telling them that they will be released whenever jail staff "feels" like letting

them go.  As described in detail below, jail staff routinely laugh at the inmates and humiliate them with discriminatory and degrading epithets about their poverty and their physical appearance.

5.     City officials and employees—through their conduct, decisions, training and lack of training, rules, policies, and practices—have built a municipal scheme designed to brutalize, to punish, and to profit.  The architecture of this illegal scheme has been in place for many years.[1]

6.     In 2014, the City of Jennings issued an average of more than 2.1 arrest warrants *per household* and almost 1.4 arrest warrants *for every adult*, mostly in cases involving unpaid debt for tickets.  If the rest of the Saint Louis metropolitan area generated revenue from its courts at the rate done by relatively low-income Jennings, it would have made more than $670 million in the past five years.

7.     The City's modern debtors' prison scheme has been increasingly profitable to the City of Jennings, earning millions of dollars over the past several years.  It has also devastated the City's poor, trapping them for years in a cycle of increased fees, debts, extortion, and cruel jailings. The families of indigent people borrow money to buy their loved ones out of jail at rates arbitrarily set by jail officials, only for them later to owe more money to the City of Jennings from increased fees and surcharges.  Thousands of people like the Plaintiffs take money from their disability checks or sacrifice money that is desperately needed by their families for food, diapers, clothing, rent, and utilities to pay ever increasing court fines, fees, costs, and surcharges.  They are told by City officials that, if they do not pay, they will be thrown in jail.  The cycle repeats itself, month after month, for years.

---

[1] *See, e.g.*, T.E. Lauer, *Prolegomenon to Municipal Court Reform in Missouri*, 31 Mo. L. Rev. 69, 93 (1966) ("Our municipal jails are, in almost every case, nothing but calabooses suited at best for temporary detention. The worst of them are comparable with medieval dungeons of the average class; they are the shame of our cities."); *id.* at 88 ("[I]t seems that many citizens of the state are being confined needlessly in our city jails….."); *id.* at 85 ("[I]t is disgraceful that we do not appoint counsel in our municipal courts to represent indigent persons accused of ordinance violations."); *id.* at 90 ("It is clear that many municipalities have at times conceived of their municipal courts in terms of their revenue-raising ability….").

8.      The treatment of Samantha Jenkins, Edward Brown, Keilee Fant, Byeon Wells, Meldon Moffit, Allison Nelson, Herbert Nelson Jr., and Tonya DeBerry reveals systemic illegality perpetrated by the City of Jennings against some of its poorest people.  The City has engaged in the same conduct, as a matter of policy and practice, against many other impoverished human beings on a daily basis for years, unlawfully jailing people if they are too poor to pay debts from traffic tickets and other minor offenses.  The result is a Dickensian system that flagrantly violates the basic constitutional and human rights of our community's most vulnerable people.

9.      By and through their attorneys and on behalf of a class of similarly situated impoverished people, the Plaintiffs seek in this civil action the vindication of their fundamental rights, compensation for the violations that they suffered, injunctive relief assuring that their rights will not be violated again, and a declaration that the City's conduct is unlawful.  In the year 2015, these practices have no place in our society.[2]

## Nature of the Action

10.      It is and has been the policy and practice of the City of Jennings to jail people when they cannot afford to pay money owed to the City resulting from prior traffic tickets and other minor offenses without conducting any inquiry into the person's ability to pay and without considering alternatives to imprisonment as required by federal and Missouri law.

11.      It is and has been the policy and practice of the City to jail indigent people for these debts without informing them of their right to counsel and without providing adequate counsel.

12.      It is and has been the policy and practice of the City to hold prisoners in the City jail indefinitely unless and until the person's family or friends can make a monetary payment

---

[2] The Plaintiffs make the allegations in this Complaint based on personal knowledge as to matters in which they have had personal involvement and on information and belief as to all other matters.  The Plaintiffs have attempted to obtain records from the City, but the Plaintiffs have been provided records that they believe to be incomplete and inconsistent with information in their possession.

4

sufficient to satisfy the City.  It is and has been the policy and practice of the City to bargain with inmates and their families on an amount of money that the City will accept for release.

13.     It is and has been the policy and practice of the City to arbitrarily and incrementally reduce the amount of money required for release throughout a person's indefinite detention, eventually releasing the person for free if the City determines that it is unlikely to profit from further detention.

14.     It is and has been the policy and practice of the City to issue and enforce invalid arrest warrants, to threaten debtors that they will be jailed if they do not show up with money, to hold debtors in jail for a week or more without any judicial appearance, and to set and subsequently modify monetary payments necessary for release arbitrarily and without formal process.

15.     It is and has been the policy and practice of the City to confine impoverished people who cannot afford their release in grotesque, dangerous, and inhumane conditions.

16.     The Plaintiffs seek declaratory, injunctive, and compensatory relief.

**Jurisdiction and Venue**

17.      This is a civil rights action arising under 42 U.S.C. § 1983, 18 U.S.C. § 1595, and 28 U.S.C. § 2201, *et seq*., and the First, Fourth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

18.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

**Parties**

19.      Plaintiff Samantha Jenkins is a 47-year-old woman.  Plaintiff Edward Brown is a 62-year-old man.  Keilee Fant is a 37-year-old woman.  Plaintiff Byeon Wells is a 34-year-old man.  Plaintiff Meldon Moffit is a 42-year-old man.  Plaintiff Allison Nelson is a 23-year-old

woman.  Plaintiff Herbert Nelson, Jr. is a 26-year-old man.  Plaintiff Tonya DeBerry is a 52-year-old woman.  All of the named Plaintiffs are residents of the Saint Louis area.

20.     Defendant City of Jennings is a municipal corporation organized under the laws of the State of Missouri.  The Defendant operates the Jennings City Jail and the Jennings Municipal Court.

### Factual Background

**A.     The Plaintiffs' Imprisonment**

**i.    Samantha Jenkins**

21.     Samantha Jenkins is a 47-year-old mother of six children.

22.     Ms. Jenkins has been jailed for unpaid debts by the City of Jennings on numerous occasions over the past 15 years.  On none of the occasions did the City of Jennings provide her an attorney, and the City never made any meaningful inquiry into her indigence prior to jailing her or during her confinement.

23.     As a result, Ms. Jenkins has spent a total of months languishing in dangerous conditions in the Jennings City Jail, solely because she was too poor to buy her release.

24.     Ms. Jenkins' problems with Jennings began more than a decade ago, when she was homeless and addicted to crack cocaine.  Ms. Jenkins, who had lost custody of her kids at the time, entered a grocery store and stole several pieces of beef.  She was caught and eventually fined by the City of Jennings.[3]

---

[3] Ms. Jenkins was kept in pretrial custody for weeks solely because she could not afford a small amount of cash.  She was not represented by counsel in that case, and she pled guilty unrepresented when the City informed her that she could be released from jail if she pled guilty and accepted a purely monetary fine.  She was ticketed for similar petty theft on at least two occasions during this period.

25.     Over the next decade or more, despite not being sentenced to jail in the case, Ms. Jenkins has spent months locked in Jennings' unsanitary and overcrowded jail because of her inability to pay the monetary fines and costs arising from that judgment.

26.     Ms. Jenkins has been clean and sober since 2010.  She is now trying to live a flourishing life with her family and three grandchildren.  She remains frightened every day that the City of Jennings will jail her again because the City claims that she still owes it money.

27.     Her fears are real.  In the years since the judgment was entered in City court, the City of Jennings has imprisoned Ms. Jenkins on at least 19 occasions, including on warrants relating to her nonpayment and instances in which she turned herself in after missing payments. She would sometimes be held for up to a week before being taken to a judicial officer.  On many occasions, she told the City prosecutor and judge that she could not afford to make any payments. In response, City officials told her that she could not get out of jail unless she paid the City money. Instead of informing her of her right to an attorney, City officials told her to make a phone call to family to get money for her release.

28.     As she sat in jail, the amount of money the City required her to pay for her release would incrementally decrease.  On several occasions, the City eventually let her out of jail without requiring any payment.  On some occasions she was released after being taken to the hospital due to becoming ill amidst the conditions in the City jail.

29.     In late November 2012, Ms. Jenkins was released from 18 months in state prison for a technical parole violation in a case having nothing to do with Jennings.  Her Missouri parole officer informed her that she had an outstanding warrant in Jennings on an old closed municipal case and encouraged her to go clear it up.  Ms. Jenkins went to Jennings to clear up the warrant in early December 2012.  Instead of being given a court date, she was jailed.  She was told by City

jail guards that she could pay them approximately $1,500 and be released immediately.  Otherwise, they told her, she would be kept in jail indefinitely.  She could not afford to pay the City.  She remained in jail without a lawyer and without seeing a judge for several days until the following Tuesday, when she was brought to court.

30.     When she appeared in court, the City of Jennings was represented by an experienced prosecutor, but Ms. Jenkins was not given an attorney.  In a matter of seconds, her hearing was over.  The City judge told her that her that she would be released only if she paid approximately $1,500.  He then told her: "see you next week."  She was returned to the jail.  No inquiry was made into her ability to pay.

31.     The following Tuesday, the hearing proceeded in materially the same manner, except that the judge told her that she could be released if she paid $300.  This time, however, he added that her release amount "will not go below $300."  He then said: "see you next week."  She was returned to the jail.  No inquiry was made into her ability to pay.

32.     As Ms. Jenkins sat in the Jennings jail, not knowing when she would be released, she met many other women in her position.  As Ms. Jenkins talked with the other women jailed for non-payment, none of them could see a way out of the spiral of jail and debt in which they were trapped. Ms. Jenkins felt powerless and completely defeated.

33.     On December 23, 2012, two days before what was supposed to be her first Christmas with her children in two years, Ms. Jenkins' family was able to borrow and raise $300 from friends and relatives to buy her out of jail.  They brought the money to the Jennings jail, and the City released Ms. Jenkins immediately after weeks in its custody.  The clerk gave her a new court date.

34.     When Ms. Jenkins returned to court on that date, she was told her that her old fines were now approximately $1,800, and the judge ordered her to pay $100 per month.  Ms. Jenkins told the judge that she was unemployed and just out of prison and did not have any money.  The judge told her that she would be jailed if she missed a payment.  Pursuant to City policy, no hearing, inquiry, or meaningful process accompanied the decision to order Ms. Jenkins to pay $100 per month.  She was not represented by an attorney.

35.     Despite being indigent and destitute, Ms. Jenkins borrowed money to pay the court in each of the first few months after her jailing.

36.     After several months, Ms. Jenkins went back to the court without any money.  She again appeared on the Tuesday evening docket without an attorney, and the City was represented by the City prosecutor.  When she told the judge that she did not have any money, the judge told her that he would give her 72 hours to pay and that she would go to jail if she did not bring the money by 4:01 p.m. on Friday afternoon.

37.     Ms. Jenkins was unable to make a payment by that date, and the City issued a warrant for her arrest, even though she had not missed a court date.

38.     Pursuant to their policy and practice, the City prosecutor and City judge did not make any inquiry into her ability to pay or into any alternatives to imprisonment as required by federal and Missouri law.  The City did not appoint an attorney to represent Ms. Jenkins and to explain to her what was happening.

39.     The warrant remained for Ms. Jenkins's arrest—threatening her at any moment with forcible jailing every time she went outside for almost a year-and-a-half—until Ms. Jenkins's current attorneys intervened.  Pursuant to its policy, the City removed the warrant when an attorney entered an appearance, a benefit not afforded to unrepresented indigent people.

9

40.     At the time she was jailed in 2012, Ms. Jenkins did not own a house, car, financial instruments, or any other significant assets.  She did not have a bank account. She was living in extreme poverty.

41.     The weeks that Ms. Jenkins spent in the City jail in 2012 were among the worst in her life.  The jail was extremely cold as the temperatures dropped outside, and inmates were allowed only one thin blanket.  The City's jail guards refused to give women a second blanket even though numerous women were begging for blankets and even though the jail had extra blankets.

42.     The cell in which Ms. Jenkins stayed for weeks was a single overcrowded room with several bunks, a toilet, two tables, and a shower.  For the duration of her stay, there were consistently about 15-16 women forced to stay in the small room, with several spread out on floor mats covering nearly the entire cell floor.

43.     Two women were forced to sleep on top of each of the two eating tables in the room.  Another woman slept next to the open toilet and another next to the shower.

44.     The toilet and shower were not cleaned by the City.  As a result, they reeked of excrement and mildew.  The stench emanating from the shower was a constant fact of life for the women in the overcrowded cell.  The shower was visibly strewn with black mold.

45.     The women were never let outside.

46.     The women were never given a toothbrush or toothpaste.

47.     Never, in any of her many visits to the Jennings jail over the course of more than a decade, has Ms. Jenkins seen a woman brushing her teeth.

48.    When a woman purchased her way out or was otherwise released, she would often try to leave her blanket for other shivering women.  As soon as Jennings City Jail guards discovered an extra blanket, they would forcibly remove it from the remaining women.[4]

49.    Jail guards pervasively taunted the women.  The guards told the women that it would "be a while" before they would be let free.  Guards joked to the women that a man had been sitting in the jail for more than a month on a $1 release amount that the City refused to lower.

50.    Guards also threatened to say bad things to the City judge about the behavior of the women and told the women that the judge would not let the women out as a result.

51.    The jail conditions experienced by Ms. Jenkins are materially the same as the conditions described throughout this Complaint and to those described by numerous other witnesses and victims of the City's policies and practices over a consistent period of many years.

52.    Ms. Jenkins still owes significant debts to the City for unpaid fines and costs.  She is frightened that the City will again jail her indefinitely until she and her family can pay enough to secure her release.[5]

### ii.    Edward Brown

53.    Edward Brown is a 62-year-old resident of Jennings.

54.    Mr. Brown is homeless.  Mr. Brown has struggled in the past several months to find a place to stay every night after the cold weather made it impossible for him to return to the house at which he had been squatting without heat or running water.  He suffers from serious back and lung illnesses and depends on Social Security Disability benefits and food stamps for his survival.

---

[4] On one occasion, Ms. Jenkins witnessed jail guards hold ammonia to the face of a woman who has passed out on the floor, burning the skin off of the woman's nose and lips.

[5] Ms. Jenkins has also been kept in custody for old unpaid fines and costs because she could not afford to pay for her release in the City of Florissant.

55.     Mr. Brown has received numerous tickets from the City of Jennings over the past several years for various offenses, including supposed violations of home occupancy regulations (including allegedly not cutting his grass), allowing his girlfriend to sleep over at his house without listing her on an occupancy permit, inspections, ordinances regarding his pet dog, and trespassing at his own home.

56.     At the end of 2010, Mr. Brown was jailed by the City and told by City employees that he would not be released from jail unless he paid several hundred dollars.  He remained in the Jennings jail for nearly two weeks until jail staff reduced the release amount to approximately $100.  He was not appointed an attorney.  When he was released from Jennings jail, he was sent to jail in the City of Pine Lawn to be held for unpaid tickets in that city.

57.     In April 2011, Mr. Brown was again jailed by Jennings and told that he would not be released from jail unless he paid several hundred dollars.  Jail officials brought Mr. Brown to court each Tuesday, where the judge would ask if he had money for the City.  Each week, Mr. Brown told the court that he did not have any money.  Each week, the judge then told Mr. Brown that he had better bring "my money" down to the City clerk.[6]  Mr. Brown was not appointed a lawyer and no inquiry was made into his indigence.  Every night, he wondered when he would be allowed to leave.

58.     Mr. Brown languished in the Jennings jail for nearly a month before the City allowed him to leave for free in late May 2011.  When Jennings released him from its custody, the City transferred Mr. Brown to the custody of the City of Pine Lawn because Mr. Brown owed

---

[6] This phrasing of bringing "my money" down to the City has been routinely used for years by the City judge.  On at least two occasions, when Mr. Brown appeared in court for a hearing when he was not in custody, the judge ordered him to go away and bring "my money" back down to the court by 9:00 p.m. that night.

debts from old tickets to the City of Pine Lawn.  Mr. Brown spent another extended period in jail in Pine Lawn because he could not afford to buy his release.

59.     Mr. Brown was arrested again in September 2011 and taken to the Jennings jail. He was again told that he could buy his freedom for money.  This time it was $200.  Because he did not have $200, Mr. Brown languished in the City jail for 26 days before jail staff decided to let him out for free.  Again, he was not provided an attorney to help him understand what was happening to him and to represent him, and no inquiry was made into his ability to pay.  Even though he spent 26 days in jail because of his poverty before the City of Jennings arbitrarily released him, Mr. Brown was not yet a free man.  The City again sent him to Pine Lawn, where he again languished in jail because he was too poor to buy his freedom.

60.     Mr. Brown was jailed again by the City in February 2012 for several days until the release amount was lowered by jail staff to approximately $100, and a concerned friend was able to buy his release.  Mr. Brown was not brought to court.

61.     In October 2012, Mr. Brown was arrested and taken again to the Jennings jail.  He was told that his release amount this time was approximately $200 and that he would not be let out of jail unless he paid that amount.  Mr. Brown was held in jail for several days until the following Tuesday when he was brought to court.  Once again, the City of Jennings was represented by the City prosecutor, but Mr. Brown was not provided an attorney.  Pursuant to City policy, no inquiry was made into his ability to pay.  The court told Mr. Brown that he would not be released unless he paid his $200.  Mr. Brown was returned to the jail.  The following Tuesday, Mr. Brown was brought again to the City court.  This time, Mr. Brown was told that his release amount had been lowered to $100.  Mr. Brown could not pay that amount and was returned to the jail.

62. The following Tuesday, Mr. Brown was brought again to the City court. Mr. Brown begged the judge to let him go because he could not afford to pay. Mr. Brown was allowed to be released for free. When Mr. Brown was released, the City held him in custody until the City of Pine Lawn picked him up, and he again languished in the Pine Lawn jail for several days because he could not pay the release amount of $300 required by Pine Lawn.

63. In early December 2013, Mr. Brown was again arrested and brought to the Jennings jail because he had unpaid tickets. He was told that he would not be released unless he paid $200. After approximately four days, Mr. Brown was told that his release amount had been lowered to $100. On December 14, 2013, a friend was able to obtain $100 to get Mr. Brown out of jail. Mr. Brown never saw a judge and was not taken to court during his detention.

64. Mr. Brown was arrested and taken to the Jennings jail again in May 2014 because he had unpaid costs and fines from old tickets. Mr. Brown was again told that he would not be released unless he paid $200. Mr. Brown was then so sick and that he was released from Jennings custody for free after two days because, he was told, the jail did not want to deal with his serious medical problems.

65. Mr. Brown was arrested and brought to the Jennings jail again in late July 2014. He was told that he would not be released unless he paid several hundred dollars. After two days of telling jail staff that he could not pay and that he needed to go to the hospital, Mr. Brown convinced jail staff to drop his release amount to $200. Mr. Brown gained access to his SSI benefits card and paid the $200 to be released.

66. On several of his jailings, Mr. Brown depended on his concerned home health care worker to come and pay for his release.

14

67.     During his many times in the Jennings jail, Mr. Brown endured dangerous and humiliating conditions.

68.     Mr. Brown endured materially the same conditions as described elsewhere in this Complaint.  For example, Mr. Brown was forced to stay in overcrowded cells with an unbearable stench from uncleaned excrement, mildew, and mold that the City refused to clean.

69.     During all of his time in the jail, Mr. Brown was only offered a shower on one occasion.  He was never given a toothbrush or toothpaste.

70.     Mr. Brown cannot eat certain foods, such as cheese and milk.  However, jail guards made no effort to accommodate his dietary restrictions, and he therefore lost a significant amount of weight and was in significant pain the entire time.

71.     Mr. Brown was also refused access to prescription medicine and to a machine that he needs to assist him with breathing as a result of a lung disease.  On one occasion, Mr. Brown, who is homeless, arrived at the jail in severe pain due to his feet being nearly frozen inside his steel toed shoes.  Although a paramedic came to the jail and recommended that Mr. Brown be taken to a hospital, the jail staff refused to allow him to go to the hospital.  Because of the lack of adequate medical attention to his feet, Mr. Brown now suffers from chronic pain in his feet.

72.     Mr. Brown has observed brutal and violent behavior by Jennings jail guards.  For example, Mr. Brown has observed guards mace people and strap them to chairs as punishment.

73.     Jennings guards also routinely taunted Mr. Brown and other inmates.  Guards told Mr. Brown that he was not going to get his medication and that he would stay in jail until he paid them.  Guards routinely mocked inmates by saying that they would be held in jail until they paid.

74.     Jail guards told hungry inmates that they would be given extra food rations and time outside the cell if they agreed to perform janitorial labor.

15

75.     Mr. Brown also observed courtroom staff and the City judge tell people routinely that they would be put in jail if they showed up to court without money on repeated occasions.

76.     Although Mr. Brown was indigent, he was never appointed an attorney by the City, and the City made no meaningful inquiry into his ability to pay.

77.     Mr. Brown still owes significant debts to the City for unpaid fines and costs.  He is frightened that the City will again jail him indefinitely until he can pay enough to secure his release.

### iii.  Keilee Fant

78.     Keilee Fant is a 37-year-old woman.  She works as a certified nurse's assistant and has been trying to support herself and her children by doing similar work for nearly 20 years.  In the past 19 years, she has been jailed by the City of Jennings at least seven times.

79.     In the past 16 months, Ms. Fant has been jailed by the City of Jennings for unpaid debt on at least four occasions.  On the first of these four occasions, she was arrested for an unpaid ticket warrant while taking her children to school in October 2013.[7]  When she arrived at the Jennings jail, she was told by jail staff that she would be kept in jail indefinitely unless she paid $300.  She informed jail staff that she could not afford to pay $300.  After three days in jail, the jail staff reduced her release amount and let her go for free from the custody of the City of Jennings.

80.     Ms. Fant's supposed "release" from the City's custody was just the beginning of a Kafkaesque journey through the debtors' prison network of Saint Louis County—a lawless and labyrinthine scheme of dungeon-like municipal facilities and perpetual debt.  Every year, thousands of Saint Louis County residents undergo a similar journey, including the Plaintiffs in this case.

---

[7]As is the case for thousands of people, many of Ms. Fant's traffic tickets have resulted from her inability to afford to pay her *other* tickets, which has prevented her from getting her driver's license back because of a state and municipal government policy and practice of invalidating licenses for those who cannot afford to pay old tickets.

81.     After Ms. Fant's "release" from Jennings custody, the City of Jennings kept Ms. Fant in its jail until her family could pay the several hundred dollars required for release by the City of Bellefontaine Neighbors.  Bellefontaine Neighbors is so small that it does not have its own jail.  Instead, it paid the City of Jennings to confine its inmate debtors in the Jennings jail.  After several days, Jennings jail staff told Ms. Fant that Bellefontaine Neighbors had reduced her release amount.  Jail officers allow inmates to use a free phone in an office if they say that they will be able to get cash by calling friends or family; otherwise they are not permitted to use the free phone. Ms. Fant called her family to inform them of the reduced amount, and they were able to raise the money to buy her release.  After paying the City of Bellefontaine Neighbors, Ms. Fant was "released" but kept in the Jennings jail for three more days, supposedly in the "custody" of Velda City.  Velda City eventually informed Jennings officials that it declined to pick her up.  Ms. Fant was then transported to the custody of Saint Louis County, where she was kept for three days before being "released" from County custody.  Although Ms. Fant was "released" from the custody of Saint Louis County, she was not set free.  Ms. Fant languished eight more days in the County jail because she could not afford the release amounts for unpaid tickets in two other cities too small to have their own jail: the City of Normandy and the City of Beverly Hills.

82.     While confined in the Saint Louis County facility on behalf of these tiny towns, jail officials coerced inmates who could not afford to pay for phone calls or food by offering free phone calls to family members and candy in exchange for doing the jail laundry without monetary compensation.

83.     After eight days, she was taken to court in the City of Maryland Heights, where the judge "released" her for free.  Nonetheless, Ms. Fant was still not free.  Instead, she was transported

17

to Ferguson.  Ferguson officials told her that she would be held indefinitely unless she paid over $1,000.  After three days, they let her out for free.

84.     Ms. Fant was again arrested and brought to the Jennings jail in January 2014.  After she could not afford to pay the release amount of several hundred dollars, she was told by jail staff that her release amount had been reduced to $100.  A jail guard told her that since they had released her for free the previous time, he did not want to do that again. After six days, her family paid $100, and she was again released to the custody of another municipality.  Once again, she was not brought to court and not provided a lawyer.

85.     After her "release," she was again kept in the Jennings jail and shifted to the custody of the City of Bellefontaine Neighbors and Velda City.  She was then taken to Saint Louis County. From the County jail, she was then transported to Maryland Heights for several days, and then again to Ferguson.  Ferguson jail staff told her that her release amount was approximately $1,400. They told her that she would be held indefinitely until she paid it.

86.     Demoralized, desperate, and weary of being transferred from jail to jail, Ms. Fant asked jail staff if they would accept $1,000, which she thought her family could raise from friends and relatives.  The jail officer told her that he wanted to call the Chief of Police to ask if that amount was sufficient.  The Chief of Police approved her release if her family could bring $1,000, and her family came to Ferguson and bought her release from the Ferguson jail.  She was released from the Ferguson jail immediately after her family paid $1,000.

87.     Ms. Fant was again arrested and brought to the Jennings jail in April 2014.  She could not afford to pay the release amount of several hundred dollars that jail officials told her would be required for her to get out.  After one day in jail, jail officials reduced her release amount to $100, and her family bought her release.

18

88.     Ms. Fant was again arrested and brought to the Jennings jail in June 2014.  She could not afford to pay the several hundred dollars that jail officials told her was required for her release.  On her third day in jail, her release amount was reduced to $100, and her family bought her release.  When she was released from the custody of Jennings, jail officials informed her that she was then being held in the Jennings jail by Bellefontaine Neighbors unless she paid $100.  She informed officials that she could not afford the $100.  After three days, Jennings jail officials let her out of the custody of Bellefontaine Neighbors for free.  Jennings jail officials then told her that she was in the custody of Velda City and that her release amount was $300.  She informed City officials that she could still not pay $300, and they informed her that the least that they would take was $100.   After three more days in custody, she was transported to Saint Louis County, where she was eventually released, after three more days, to the custody of Maryland Heights.  The judge in Maryland Heights then told Ms. Fant that if she did not bring the money that she owed to the next court appearance, he would jail her.  Maryland Heights attempted to transport her to Ferguson, but Ferguson responded that it was remodeling its police department and that it declined to take her.  She was released for free.

89.     On one occasion, afraid of being jailed again, Ms. Fant called the Jennings clerk and said that she could pay $90 instead of the $100 that she owed for her monthly payment.  She told the clerk that she could get the other $10 after she got paid by her job.  The clerk told her that Jennings would not accept $90 and that she had better make the full $100 payment.

90.     During these repeated and indefinite jailings, Ms. Fant was fired from several jobs because of absences.  She was indigent and depending on food stamps to supplement her income to feed her children.

91.     Similar experiences happened to Ms. Fant more than a dozen times in the past two decades, including one occasion in which she was held in jail by the City of Ferguson for nearly 50 days without a toothbrush, toothpaste, shower, soap, or change of clothes for unpaid traffic tickets because she could not afford to buy her release.

92.     Although Ms. Fant was indigent and struggling to meet the basic necessities of life for herself and her children, she was never appointed an attorney by the City, and the City made no meaningful inquiry into her ability to pay.  Ms. Fant was not brought to the courtroom and was instead told by jail staff that she would not get to go home because she had to either pay for her release or wait until they decided to release her for free.[8]

93.     Ms. Fant has endured materially the same inhumane and unsanitary Jennings jail conditions described in this Complaint.  In addition to enduring overcrowding with other inmate debtors, Ms. Fant was forced to languish in the Jennings jail without basic hygiene (for example, she was told that she would not be given feminine products for menstruation), medical care, and exercise.[9]

94.     When women held for non-payment complained to jail staff about the inadequate food rations, they were given gloves and cleaning supplies and told that they would be given extra food if they agreed to clean the jail without monetary compensation.

95.     Ms. Fant also observed rampant taunting and humiliation perpetrated by Jennings jail guards.  Jail staff routinely told female inmates that they were being too loud and that they smelled bad.  The staff joked that the women would not be released until the guards "let them."

---

[8] Jail staff informed inmates routinely that it was City policy not to bring traffic violators to court.  Instead, they told inmates held on unpaid tickets that they would be held until they paid or until they decided to let them out for free.

[9] On one occasion, jail staff agreed to go to the store to buy feminine products for the women, but the male officer returned with panty liners instead of tampons.  Jail staff told the women that they would have to use the panty liners instead and refused to go back to the store.

96.     Ms. Fant still owes significant debts to the City for unpaid fines and costs.  She is frightened that the City will again jail her indefinitely until she and her family can pay enough to secure her release.

iv.     **Byeon Wells**

97.     Byeon Wells is a 34-year-old man.

98.     Mr. Wells has received various traffic citations and other violations in the City of Jennings over the past five years.

99.     On February 9, 2013, Mr. Wells was arrested and taken to the Jennings jail.  When Mr. Wells got to the Jennings jail, he was told that he would be released if he paid over $1,000. Mr. Wells and his wife were homeless at the time, and they could not afford to pay that amount of money.  Mr. Wells did not own any significant assets, and he was impoverished and struggling to survive.

100.    Mr. Wells was brought to court the following Tuesday.  He was unrepresented by an attorney, but the City of Jennings was represented by an experienced prosecutor.  The judge asked Mr. Wells if he could pay for his release.  Mr. Wells told the judge that he could not afford to pay.  The judge sent him back to jail and told him: "see you next week."

101.    The following Tuesday, the judge lowered the release amount to $500 and asked if Mr. Wells could pay it.  Mr. Wells again told the court that he was too poor.  The judge again told Mr. Wells: "see you next week."

102.    For the next three weeks, Mr. Wells was brought to court and told that he would not be released unless he paid $500.  However, Mr. Wells was informed at the jail that most of the inmate debtors would have their release amounts lowered to $100, and his release amount was lowered to $100 on March 12.  Mr. Wells could still not afford that amount.

103.    After another day—and after over a month in the Jennings jail since his arrest—Mr. Wells told his family that he could leave the Jennings jail if he paid his jailors $100.  His sister came up with $100, and he was released immediately.

104.    When Mr. Wells was released, he was given a new court date and told to return. Jennings released Mr. Wells to state custody, where he remained for a little more than a year because of a parole warrant on a case having nothing to do with Jennings.  Thus, at the time of his next Jennings court date, Mr. Wells was incarcerated by the State of Missouri.  While he was in state custody, Mr. Wells sent a letter to Jennings explaining that he could not make his court date because he was in state custody.

105.    Nevertheless, after his release from state custody in early July 2014, Mr. Wells was arrested during a traffic stop in which he was a passenger in a vehicle driven by someone else. Though he was a mere passenger, officers demanded his ID, and he was arrested because of his unpaid debt and failure to appear in Jennings while in state custody.  Mr. Wells reminded Jennings officials that he had sent them a letter and had not failed to appear because he had been in prison, and jail staff confirmed to Mr. Wells that they had his letter on record.

106.    But Jennings nonetheless kept Mr. Wells in jail. Jail guards told Mr. Wells that he would not be released unless he paid $1,000 to the City of Jennings.

107.    Mr. Wells languished in jail and was not taken to court for a week-and-a-half. When he got to court, he told the judge that he had missed the court date because he had been in prison and that he had sent the City a letter explaining his absence.  The judge refused to reduce the release amount.

108.    Mr. Wells's parole officer eventually came to Jennings to show Jennings the prison release paperwork to demonstrate that Mr. Wells had been locked up at the time of his 2013 court

appearance.  After his parole officer intervened, Jennings jail staff reduced Mr. Wells's release amount to $200.

109.   After a couple of weeks in the Jennings jail, Mr. Wells's family was able to raise the money and, upon payment, the City released Mr. Wells immediately to the custody of another City to whom he owed ticket debts.

110.   Although Mr. Wells was indigent, he was never appointed an attorney by the City, and the City never made any meaningful inquiry into his ability to pay.  The City was represented by an experienced prosecutor at Mr. Wells's court appearances.

111.   While locked for weeks in the Jennings jail, Mr. Wells endured conditions that were shocking and unlawful in materially the same way as described in this Complaint.[10]

112.   Jennings jail staff routinely taunted people because they could not afford to get out. Jail guards told inmates that if they didn't like the conditions, they could always buy their way out.

113.   Mr. Wells was denied access for the entire duration of each jailing to a toothbrush or toothpaste.  Like the other Plaintiffs, Mr. Wells languished in jail for weeks without being able to purge from his mouth the stench and taste of decaying teeth and gums.

114.   Mr. Wells was denied a pillow and was given only one small blanket.

115.   Mr. Wells was forced to sleep near a toilet that the City did not clean.  The entire cell reeked of the stench of feces and mildew.  The cell's shower was overgrown with mold and slimy debris, and the jail staff did not even permit Mr. Wells to wash his underwear

116.   The cell walls were covered in mucus and blood.

117.   Mr. Wells still owes significant debts to the City for unpaid fines and costs.  He is frightened that the City will again jail him indefinitely.

---

[10] Mr. Wells was also locked up in the Jennings jail for unpaid traffic tickets on several other occasions for a few days each time between 2010 and 2013.

118.    Mr. Wells has also been kept in custody for old debts because he could not afford to buy his release in the City of Dellwood and Saint Louis City, who would take custody of him either before or after he was released from Jennings.

**v.      Meldon Moffit**

119.    Meldon Moffit is a 42-year-old man.

120.    In the summer of 2013, Mr. Moffit was pulled over and informed that his driver's license had been suspended.  When he appeared in court, he was told that the charges would be dropped if he obtained the proper paperwork from the DMV.  Mr. Moffit went to the DMV and obtained the proper documentation that his license had been reinstated.

121.    When Mr. Moffit appeared again in court, the judge gave him a $469 fine and put him on a "payment docket" because he could not afford to pay the ticket in full.

122.    Mr. Moffit was indigent and not able to make payments on the ticket.  The City did not appoint a lawyer for him.

123.    In the courtroom, Mr. Moffit observed people being asked if they had money and saying no.  Then, he observed the judge ordering them to have a seat and telling them to find a way to come up with the money.  He observed people being jailed when they could not pay.

124.    In May 2014, Mr. Moffit was arrested and taken to the Jennings jail.  When he arrived, he was told that he would be held in jail until he paid slightly more than $100.

125.    Mr. Moffit was indigent and unemployed at the time, and he languished in the Jennings jail for five days until his niece was able to pay $110 for his release.

126.    In July 2014, Mr. Moffit was pulled over for allegedly "impeding the flow of traffic."  He was arrested and again brought to Jennings and locked in the Jennings jail.  He was

told by jail staff that he would not be released until he paid $122 toward his old debts.  After several days, his niece, his mother, and his sister were able to raise $122 to pay for his release.

127.   Mr. Moffit did not appear before a judge on either occasion.  Rather, he was informed both times by officers and jail guards that he would be held indefinitely until he paid enough money.

128.   While in the Jennings jail, Mr. Moffit experienced materially the same jail conditions described in this Complaint.

129.   Mr. Moffit was permitted to shower one time per week, although the water in the shower was clogged by slimy debris and reeked of pungent stenches, which appeared to be feces and mold.

130.   Mr. Moffit was denied a toothbrush, toothpaste, a change of underwear, and extra blankets for the duration of his stay.  He was given only one thin blanket with holes, and guards refused the repeated requests of Mr. Moffit and other inmates for extra blankets to deal with the cold temperatures in the cell.

131.   The jail cell was so overcrowded with men who could not raise sufficient money to buy their release that the inmates were forced to sleep on mats on the floor.  The mats and blankets were often not cleaned when inmates left and before they were given to new inmates.

132.   Jennings jail guards also repeatedly taunted the inmates.  Each day, inmates asked guards if their release amounts had been lowered.  Each day, Mr. Moffit heard guards tell inmates that the guards would be going home that day in a nice car while the inmates had to stay in the jail because they could not pay.

133.   Some inmates were coerced into cleaning parts of the jail for extra food rations.

134.   Mr. Moffit lives in constant fear that he will again be arrested because he cannot afford to pay the money owed from his tickets.

135.   Although Mr. Moffit was indigent, the City never appointed an attorney to represent him.  The City never made any meaningful inquiry into his ability to pay

**vi.   Allison Nelson**

136.   Allison Nelson is a 23-year-old woman.  She now works at a clothing store earning approximately the minimum wage.

137.   Ms. Nelson has been jailed repeatedly by the City of Jennings since she was a teenager because she has not been able to pay fines and costs from traffic tickets.  On each occasion, Ms. Nelson has been kept in jail, even though she was indigent, because she could not afford a sum of money set by the City.

138.   In 2011, Ms. Nelson received traffic tickets in the City of Jennings.  She appeared in court unrepresented.  Ms. Nelson pled guilty to the traffic tickets and was put on a payment plan to pay $100 per month because she could not afford to pay the total cost of her tickets.

139.   Later in 2011, Ms. Nelson received a letter from the City stating that she had missed a payment and that there was a warrant out for her arrest.  She called the City clerk and said that she was frightened because she did not want to go to jail.  The City clerk told her that the City would remove the warrant if she paid her fines and costs in full.  She informed the clerk that she could not afford that much money, and the clerk told her that there was no other way for her to remove the warrant and get a court date unless she hired an attorney.  If she hired an attorney and the attorney entered an appearance, then, according to the City clerk, her warrants would be removed and she would be given a new court date.  Ms. Nelson was too poor to hire an attorney.

140.    The teenage Ms. Nelson was arrested in September 2011 while wearing a nightgown in her own yard and taken to the Jennings jail for a day until her mother paid for her release.

141.    In July 2012, Ms. Nelson was a passenger in a car when she was arrested for missing debt payments and taken to the Jennings jail.  She was told that she would not be released unless she paid $160.  She was kept in jail for a day until her family was able to pay the City $160.

142.    In January 2013, Ms. Nelson was again arrested and taken to the Jennings jail.  Staff told Ms. Nelson's family that Ms. Nelson would not be released unless they paid $1,000.  Ms. Nelson could not pay $1,000.  After a night of frantically borrowing money, Ms. Nelson's family came up with $1,000 and paid for her release from the jail.

143.    In November 2013, Ms. Nelson was again arrested because of non-payment.  When she was brought to the Jennings jail, she was told that she would not be released unless she paid $1,000.  She informed the jail staff that she could not afford to pay.  After four days, the jail staff informed her that her release amount would be lowered to $100.  A jail guard called out the names of a number of female inmates and told them that, because it was Thanksgiving, he would allow them to be released if they could come up with $100.  Her parents came to the jail and paid $100, and she was released immediately on Thanksgiving Day.[11]

144.    While in the Jennings jail, Ms. Nelson was surrounded by other women who were there because they could not afford to pay the amount that Jennings required for their release.  For example, during her most recent incarceration, she met a woman who had been in the jail for several weeks because she could not afford a $100 payment.

---

[11] Ms. Nelson was taken first to the City of Florissant, who kept her in custody until her parents paid $200.  After she bought out of custody in Jennings, she was taken to Ferguson.

145.    Ms. Nelson endured materially the same deplorable jail conditions as the other Plaintiffs.

146.    Although Ms. Nelson did not own any significant assets and was indigent, no meaningful inquiry into her indigence was ever made by the City of Jennings, and the City never appointed an attorney to represent her.

147.    Like numerous other witnesses, Ms. Nelson routinely observed City officials threaten to jail or keep in jail people in the courtroom if they did not make sufficient monetary payments to the City of Jennings.  She saw people jailed in the courtroom for repeated non-payments.

148.    Ms. Nelson also observed the City policy of courtroom guards telling anyone who showed up without money that City employees would run their names for warrants in other cities but informing people that they would not do so if the person brought money that night to pay Jennings.  Those who made payments did not have their names run.

149.    The threat of jail and the cycle of increasing debts to the City of Jennings has been a constant fact of daily life for Ms. Nelson since she was a teenager.  She has been afraid every day simply to leave her own home or to get into a car as a passenger.  Ms. Nelson's dream for years has been to join the Navy.  After passing the relevant tests as a teenager, she was told by her recruiter that she could not join until she clears up all of her unpaid traffic warrants and tickets, which she has not been able to afford to do.[12]

---

[12] Military recruiters routinely refuse to accept applicants with traffic warrants for their arrest.  ArchCity Defenders currently represents five clients who desire to enlist in the military but cannot do so as a result of warrants being issued for their arrest as a result of unpaid debts in municipal court.

150.    Ms. Nelson has also been kept in custody for old traffic ticket debts because she could not afford to pay her way out in the City of Chesterfield, the City of Pagedale, the City of Florissant, the City of Country Club Hills, and the City of Bellefontaine Neighbors.

**vii.    Herbert Nelson Jr.**

151.    Herbert Nelson Jr. is 26 years old.  Over the past seven years, the City of Jennings has kept him in jail because he was too poor to make monetary payments at least six times.

152.    Mr. Nelson was arrested and brought to the Jennings jail for unpaid fines and costs in 2008 and again in 2009.  Each time, he was told that he would not be released unless he paid a significant amount of money based on the total amount that he supposedly owed to the City.

153.    Mr. Nelson was arrested again for non-payment in April 2011.  When he was brought to the Jennings jail, he was told that he would be held indefinitely unless he paid approximately $2,000 based on his unpaid debts.  He informed jail staff that he could not afford to pay that much money.  Each day that he was in jail, his release amount was lowered.  On the third day, the amount required for his release was lowered to $300, and he was released after his mother borrowed money to buy him out of jail.

154.    Mr. Nelson was arrested again in October 2013 and brought to the Jennings jail. Again, he was told by Jennings jail staff that he would not be released unless he paid approximately $2,000.   Again his release amount was incrementally lowered.  This time, on the fourth day, the sum was reduced to $200, and his mother again borrowed the money to buy his release.

155.    Mr. Nelson was arrested again in February 2014 and brought to the Jennings jail. Again, he was told by jail staff that he would be held in jail until he paid approximately $2,000. Again his release amount was incrementally lowered as he sat in jail.  This time, on the fifth day, he was released for free.

156.    Mr. Nelson was arrested again in September 2014.  Again, he was told by jail staff that he would be kept in jail unless he paid $2,000.   Again his release amount was incrementally lowered.  This time, on the third day, it was reduced to $300, and his mother again borrowed the money to buy him out, including borrowing money from his co-workers.

157.    Mr. Nelson endured and witnessed materially the same deplorable jail conditions described in this Complaint.  For example, he was forced to remain in a filthy, overcrowded cell with other inmate debtors that reeked of excrement.  He and the other inmates were not given any toothbrush, toothpaste, hand-soap, showers, or a change of underwear.  He has never been offered a shower during any of his time in the Jennings jail, although inmates are forced to sleep next to the visibly moldy shower in the shared cell.  The cells were so overcrowded during his multiple periods of incarceration that men were forced to sleep on the floor next to the open, uncleaned toilet.  The walls were covered with dried food, mucus, and blood. The ceilings were covered with dried, congealed paper towels that previous inmates had thrown to the ceiling in an effort to cover the cold vents.

158.    The faucet was connected to the top of the toilet and was rusted over.  Inmates were afraid to drink from it.  Many inmates suffered from dehydration because they were only given one bottle of water per day.

159.    Some inmates were so desperate to supplement their food and water and to exit the cell that they agreed to perform various janitorial services.

160.    During one of his periods in the Jennings jail, Mr. Nelson developed two irritated areas on his leg that became infected and turned into boils the size of eggs.  This leg injury has subsequently persisted in various iterations for approximately two years.  On a later period of incarceration in the Jennings jail, his boils flared and popped, and he was in excruciating pain.

The Jennings jail staff refused to treat him.  Staff refused to give him antibiotics, painkillers, or a doctor, even though his pants filled with blood and puss.  He found it difficult even to sit because of the infection.

161.    Finally, after his transfer to another facility, a nurse in the Justice Center in Saint Louis City examined him and told him that the infection was related to the jail conditions because his skin had become extremely dirty by sitting in the uncleaned Jennings jail without a shower or soap.  The nurse told him that she was amazed at the large size of the boils.  She said that she believed it was turning into staph infection, although Mr. Nelson was never separated from the other inmates while he had been in Jennings.

162.    The Jennings guards repeatedly humiliated the inmates by taunting them.  Several guards laughed at Mr. Nelson after he complained and showed them his boils.

163.    Some guards told inmates that they "couldn't wait" for them to "act up" so that they could "tase" them.

164.    The guards would often crack jokes about the inmates not being able to afford to get out and made fun of inmates who were repeatedly arrested for unpaid debts.  The guards also told inmates that they would retaliate against them if they asked too many questions about their release amounts.  A culture of mockery, humiliation, and intimidation pervaded all of Mr. Nelson's trips to the Jennings jail.

165.    Once every morning, a jail employee would announce to inmates whether or not their release amounts would be lowered.

166.    Mr. Nelson was indigent for the entire duration of his jailings by the City of Jennings.  The City never brought Mr. Nelson to court or offered any formal inquiry into his indigence or his inability to pay.

167.    Mr. Nelson now works as a painter and is dedicated to supporting his five-year-old son.  Because of his recent jailings by Jennings—including one in which he was in uniform on his way to an important painting job—he has lost a number of jobs and finds it difficult to be re-hired because painting contractors know that he could be jailed on the way to any painting job.  On one occasion, a co-worker had to fill in for Mr. Nelson and then use the money earned from the job to pay for Mr. Nelson's release from the Jennings jail.  The scheme described above has prevented Mr. Nelson from growing his own painting business because he cannot obtain his driver's license, a necessity for a profession that requires him to travel to and from job sites daily with his tools.

168.    On many occasions, Mr. Nelson observed people jailed for non-payment without being represented by a lawyer despite their protestations that they were too poor to pay.

169.    Mr. Nelson has also been held in jail because of his inability to make payments in the City of Ferguson, the City of Florissant, Saint Louis County, and the City of Maryland Heights.

170.    During Mr. Nelson's most recent incarceration, he finally broke down and cried after he missed an important painting job.  The cycle of jail and debt has prevented him from getting on his feet and living any kind of meaningful life with his son.  Because of his repeated jailings, it has been difficult for him to maintain steady employment and to meet the basic necessities of life for his family.

**viii.    Tonya DeBerry**

171.    Tonya DeBerry is a 52-year-old woman.  Over the past 13 years, she has been jailed repeatedly by the City of Jennings because of unpaid court fines and costs.  Over that time period, she has paid thousands of dollars to Jennings for fines, costs, surcharges, and added fees.

172.    Ms. DeBerry was arrested and jailed by Jennings in April 2011 for non-payment. When she arrived at the Jennings jail, she was told that she would not be released unless she paid

32

$300 for the City of Ferguson.  When her family borrowed money and took it to Ferguson, the Jennings jail agreed to release her.

173.    On one occasion in 2012, Ms. DeBerry arrived late to the Jennings court while proceedings were going on.  She had arrived to make her monthly $100 payment.  She was told that the doors to the public proceedings were locked because the court was too crowded, and officers refused to let her enter to make her payment.[13]  The court officer told her to call the Jennings clerk the next day.  Ms. DeBerry called the next day, and the City clerk told her that the City would not accept payment because she was a day late.  The City told her that there was now a warrant out for her arrest because she had not paid the previous evening.  She was told that she now had to pay a "bond" of $400.  When Ms. DeBerry asked what that meant, the City clerk explained that she would be arrested if she did not pay $400 and that her debts had increased because, pursuant to City policy, a warrant fee had been added to her costs.  In order to remove the warrant and avoid arrest, she had to pay $400.  Ms. DeBerry could not afford to pay $400 to remove the warrant.

174.    In September 2012, Ms. DeBerry was again arrested and held in the Jennings jail because of her non-payment.  Jail staff threatened her with indefinite incarceration unless she paid approximately $700.  It took her family two days to borrow and raise the $700 necessary to pay for her release.

175.    In January 2014, Ms. DeBerry was again arrested because of her non-payment. When she was brought to the jail, she was told that she would not be released unless she paid

---

[13] As discussed below, Jennings routinely locks the doors to the courthouse while court is in session in flagrant violation of the United States and Missouri Constitutions.  After lawyers for ArchCity Defenders and Saint Louis University School of Law Clinics called this widespread practice to the attention of presiding Circuit Judge Maura McShane, she issued a letter to all municipal courts requiring them to open the courts to the public.  In spite of this letter, the practice persists in many courts.

approximately $2,400 because that was the amount of her total debt to the City from old fines and costs.  She was then told that she would be released for $1,400.   She stated that she was poor and that she could not afford to pay anywhere near that amount.  After two nights in jail, the City reduced her release amount to $100, and her family came to the jail and bought her release.

176.    For years, Ms. DeBerry has been afraid to leave her own home for fear that she would be arrested on warrants for non-payment and held for days or weeks until someone could borrow enough money to free her.  Ms. DeBerry is disabled and depends on federal disability support and food stamps to survive.

177.    The City of Jennings also arrested and kept in its jail for indefinite periods both of her teenage children because they could not afford to pay old traffic tickets.  Ms. DeBerry was often forced to choose between raising money to get her children released from the Jennings jail or raising money to make her own debt payments to the City.

178.    As with the other Plaintiffs, the threat of being jailed for non-payment by Jennings has been a constant fact of everyday life for Ms. DeBerry and her family for years.  It affects every decision to leave their home every day, including going to the grocery store or going to church.

179.    For the past several years, Ms. DeBerry has gone to the Jennings municipal complex every month to make payments on her traffic ticket debts.   Like numerous other witnesses, Ms. DeBerry routinely observed City officials threaten to jail or keep in jail people in the courtroom if they did not make monetary payments to the City of Jennings.  She observed the City jail people for repeated non-payments and observed the City jail people who came without money if they had warrants in other municipalities.

180.    A courthouse officer bragged to her on one occasion that the previous month they had locked up 63 people for non-payment at court.  Guards warned people if they were not paying

34

that night they better leave if they had warrants in other places, because the City policy was to run the names of people who did not bring money through a warrant database.

181.    Ms. DeBerry has paid many thousands of dollars to Jennings for ballooning costs, fines, surcharges, and fees.

182.    During her time in the Jennings jail, Ms. DeBerry was forced to endure grotesque conditions similar to those endured by the other Plaintiffs described in this Complaint.   For example, during Ms. DeBerry's time in the Jennings jail, she was subjected to cells overcrowded with other women too poor to buy their release, the constant stench of refuse and excrement, the sight of mold and bugs everywhere, the lack of any toothbrush, toothpaste, or soap, cold temperatures without adequate covering, and the sound of male inmates being beaten.

183.    The guards humiliated the women.  They would tell the women to "shut up," to quit bothering the guards, and that they would not be released if they could not come up with the money.

184.    As with all of the other Plaintiffs, the City of Jennings never made any meaningful inquiry into Ms. DeBerry's indigence prior to jailing her or keeping her in jail for non-payment. Nor did the City consider any alternatives to incarceration or provide her with an attorney.

185.    Ms. DeBerry has also been kept in custody for debts from tickets because she could not afford to pay for her release in the City of Ferguson, Saint Louis City, and Saint Louis County.

**B.**    **The City's Policies and Practices**

186.    The treatment of the Plaintiffs was caused by and is representative of the City's policies and practices concerning collecting unpaid fines, fees, costs, and surcharges relating to traffic tickets and other minor offenses for at least the past five years.[14]

---

[14] Unless otherwise stated in this Complaint, the policies, practices, and procedures of the City of Jennings described have been in existence for at least the past five years.

187.    It is the policy and practice of the City of Jennings to use its municipal court and its jail as significant sources of revenue generation for the City.  The money to be brought into the City through the municipal court is budgeted by the City in advance.[15]  As a result, the entire municipal government apparatus, including municipal court officials and City jailors, has a significant incentive to operate the court and the jail in a way that maximizes revenues, not justice.

188.    Decisions regarding the operation of the court and the jail—including but not limited to the assessment of fines, fees, costs,[16] and surcharges; the availability and conditions of payment plans; the setting of amounts required for release from jail; the issuance and withdrawal of arrest warrants; and the non-appointment of an attorney—are significantly influenced by and based on maximizing revenues collected rather than on legitimate penological considerations.

189.    In 2014, the City of Jennings issued an average of more than 2.1 arrest warrants *per household* and almost 1.4 arrest warrants *for every adult*, mostly in cases involving unpaid debt for tickets.

190.    Over the past five years, the City of Jennings, according to its public records, has earned more than $3.5 million dollars from its municipal court fines, fees, costs, and surcharges.[17]  The population of the City of Jennings, including children, is 14,700.  An equivalent budgetary revenue stream from municipal court fees for the entire Saint Louis metropolitan region would be nearly $670,000,000.

### i.  Arbitrary and Indefinite Detention of the Indigent

---

[15] The City uses the money collected through these procedures to help fund the City jail, to pay Municipal Court judicial salaries, to pay City Attorney's Office salaries, and to fund other portions of the City budget.

[16] Missouri Law requires costs to be waived for the indigent, *see* Mo. Code § 479.260, but the City ignores that law.

[17] The City also uses its jail to earn significant additional revenue by renting its jail space to other neighboring municipalities and knowingly keeps in its jail people who cannot afford to make payments to the other municipalities.

191.   As each of the Plaintiffs' cases illustrates, the City of Jennings has adopted a policy and practice of arresting people when they owe unpaid debt from judgments on old traffic tickets and other minor offenses.  When those arrestees are booked at the Jennings jail, they are told by jail staff that they can be released immediately, but only if they pay cash to the City of Jennings. If they cannot pay the City, they are told that they will be held in jail indefinitely.

192.   The amount of cash that Jennings requires for release is based on the total debt owed by the person from their judgments in old traffic and other misdemeanor cases.

193.   It is and has been the policy and practice of the City of Jennings to hold people in jail unless and until they or their families pay the City.

194.   It is and has been the policy and practice of the City of Jennings to gradually and incrementally reduce the amount of money required to buy a person's freedom.  The reason for this policy is to generate as much money as possible.  Some people's families are able to borrow and raise significant money up front to buy the release of their loved one within hours or days. The longer a person stays in the Jennings jail, however, the more it costs the City and the more certain it is that the person's family cannot raise enough money.  Thus, the City's policy and practice is to lower the amount periodically in the hope that the person can raise at least some money to buy his or her release.  City jail staff also attempt to negotiate or bargain with the person or the person's family concerning the amount of money that they are able to pay.  In many cases, after significant jail time, the City will release the person for free if it is clear that the City cannot extract any money from the person during that jail stay.

195.   Inmates find out about these incremental reductions by asking jail staff every morning what their new release amount is.  Some days they are told that the release amount has remained the same, and other days they are told that it has been reduced.  Inmates are then usually

given an opportunity to use the telephone to call family or friends who might be able to come up with enough money to pay for their release.  The incremental reductions do not happen as the result of any formal adversarial process in which the inmate participates.

196.    The City's incremental reductions of the amount required for release are designed also to punish debtors for non-payment on the theory that time in jail will encourage impoverished people to pay in the future if they know that they will be jailed for non-payment.  These threats result in people and families borrowing money at high rates of interest to release a loved one or taking money otherwise needed for food, diapers, clothing, and utilities and giving it to the City of Jennings instead.  The result has been widespread hardship for the impoverished people of Jennings, whose local government has decided to make families choose between feeding hungry children and letting a loved one languish in jail.

197.    These policies and practices have created a culture of fear among the City's poorest residents, who are afraid even to appear at the payment window or in City court to explain their indigence because they know they will be jailed by the City without any meaningful process.  The same fear motivates many very poor City residents to sacrifice expenditures on food, clothing, utilities, sanitary home repairs, and other basic necessities of life in order to scrape together money to pay traffic debt to the City.

198.    From the perspective of City officials, these coercive threats are successful.  They are successful because the threats have been crucial to pressuring family members—who have no legal obligation to pay any money to the City on behalf of indigent relatives or friends who owe money from old civil judgments—to come up with money in order to get their loved ones released from jail.  They have also been crucial in getting low-income people to forgo basic necessities of

38

life in order to pay the City in an attempt to avoid jail.  It is only through this illegal confinement and credible threats of confinement that the City is able to collect that additional money.

199.    The basic scheme of the City of Jennings is to extort—through the threat of physical confinement—money from debtors who are otherwise unable to afford to pay both the basic necessities of life and their debts to the City.  The City's policies and practices have resulted in the community knowing that impoverished debtors will be arrested and held by the City for days or weeks unless and until they pay enough cash to the City.  This scheme was designed to get impoverished people to pay onerous payment plans (for debts accumulated in cases in which they were unrepresented) that they cannot afford in order to avoid illegal jailing and, if they fail to meet their payment plan, to force impoverished people and their families to pay significant sums of money to secure a person's release from jail.

200.    When providing information to inmates, the City refers in practice to the amount of cash required for a person's release at any given moment as the person's "bond," even though the money is applied toward old unpaid debts and is set, re-set, reduced, bargained, and eventually waived without any formal process or consideration of any of the lawful considerations related to Missouri's statutory bail system.  Nor is the amount set in relation to any particular pending charge for which legal proceedings are imminent.  Indeed, inmates often do not even have future court dates set and are held indefinitely without being brought to court.  If a person subsequently misses any future "payment" date, the City, without any meaningful legal adversarial process, confiscates any previous amounts paid by the person to secure their release from jail and resets the person's debts.  The City also adds a "warrant" fee for the person's missed payment date without any legal

process.[18]  In this way, many impoverished people end up paying thousands of dollars over a period of many years to the City based on a small number of relatively inexpensive initial tickets.

201.    At any moment, a person can end this cycle by paying the balance of her debt.  It is and has been the policy and practice of the City of Jennings to allow any inmate at any time to pay the full amount of the debt owed and to be released immediately, terminating all existing "cases" for which debt is being collected.[19]

202.    It is and has been the policy and practice of the City of Jennings to keep some debtors in jail for indefinite periods without bringing them to court when they cannot pay their cash release amounts.  The City has often kept inmates unable to make monetary payments in its jail for weeks without even bringing them to the courtroom.[20]

### ii.  Debt-Collection Proceedings in the Jennings Municipal Court

203.    It is and has been the policy and practice of the City of Jennings to conduct a "confined docket" every Tuesday evening.  At that docket, some (but not all) inmates who have been unable to secure enough money for their release from custody are brought before the City clerks, City prosecutor, and City judge.  As a matter of policy and practice, inmates are not provided counsel by the City even though the City is represented by an experienced prosecutor at such proceedings.

204.    During the "confined docket," inmates are told by City officials that they will remain in jail unless they can make monetary payments based on the total amount of debt that they

---

[18] For example, the person is not arraigned on any new charge for failure to appear prior to the "warrant" fee being added, and the person is not given a meaningful opportunity to present a defense to the elements of such a potential charge or appointed an attorney to defend her on any new charge.  The money is simply added to the person's debts.

[19] The "cases" for which the City is collecting debts have, for the most part, been closed for years, with civil judgments entered requiring the payment of fines and costs.

[20] The City also follows a policy and practice of holding inmates in jail for days on behalf of other municipalities until the other municipality decides whether it will pick them up or not.

owe.[21]  Inmates are told that they will remain in jail unless they pay even though it is the policy and practice of the City of Jennings not to provide them with an attorney and not to conduct any meaningful inquiry into their ability to pay or alternatives to incarceration as required by the United States Constitution.[22]

205.    Inmates are not advised of their relevant rights under federal or Missouri law, including applicable constitutional rights and state-law defenses and procedures.

206.    Those appearing in court from jail are told that they must pay a certain amount of money or be kept in jail.  They are, as a matter of policy and practice, told to make phone calls to family members in an attempt to get family members to pay their debts.  The amount of money required for release is usually lowered at each subsequent court appearance if the person has not paid the amount since the previous appearance.  If a person is in jail long enough, that amount is usually reduced to $0, and the person is released for free without payment.

207.    It is the policy and practice of the City to lock the court and building doors while conducting its "confined docket," thereby illegally barring the public from observing arraignments, plea hearings, compliance hearings, debt-collecting proceedings, and all other public proceedings in open and closed cases in which a person is incarcerated.[23]

---

[21] Because the City holds court only one time per week, those arrested on new offenses or warrants who cannot afford the amount of money set by the City often languish in jail for nearly a week before seeing a judicial officer.  Inmates arrested on new charges (as opposed to previously unpaid debts) are told that they will not be released from custody prior to trial unless and until they make generically determined monetary payments.  Arrestees who are not indigent and who can afford the scheduled monetary payment are released immediately after booking.

[22] Because no inquiry is made into ability to pay, no inquiry is likewise made into the reasons for non-payment or alternatives to incarceration.

[23] The building doors are often opened, as a matter of practice, before the end of the confined docket so that the courtroom can be filled with those waiting for the "payment docket," which immediately follows the confined docket on Tuesday evenings.  Thus, as a matter of practice, those waiting for the "payment docket" are often able to hear the City prosecutor and City judge threatening those who cannot afford their debts with longer jail terms and sending those unable to pay back to the City jail.

When the public is permitted into the courtroom during the "payment docket," the proceedings are conducted as a matter of policy and practice as private bench conferences, with the defendant standing at the bench with the

208.    In general, it is and has been the policy and practice of the City of Jennings to conduct a "payment docket" on Tuesday evenings at the Jennings municipal complex.  It is the policy and practice of the City to hold this "payment docket" after the "confined docket."  The stated purpose of this docket is to collect payments from debtors who are too poor to pay off their entire debt to the City from old judgments.

209.    As with confined inmates, a person can end this debt-collection process at any time by paying what she owes to the City in full.  If a person is too poor to end this process, her closed "case" can go on for years and years in perpetuity after the entry of a civil judgment assessing financial penalties, with the City imposing additional fees and surcharges for late payments and threatening incarceration for missed payments.[24]

210.    On Tuesday nights, a line of several hundred people usually forms outside the building waiting to be let into the municipal complex for the "payment docket."  The crowd consists almost entirely of low-income people of color.

211.    Jennings municipal policy dictates that any person owing traffic or other debt to the City need not appear in court if the person can afford to make a payment of $100 or more to the city clerk during the previous month.

212.    All people who are too poor to pay at least $100 toward their debts are told by City officials that they are required to appear in the courtroom at the "payment docket."

213.    The courtroom is usually filled with hundreds of people, often making the wait hours for those unable to make significant payments.

---

judge.  The courtroom audience is unable to hear the content of the proceedings, other than the words of the judge, who speaks into a microphone.  No transcripts or audio recordings of proceedings are available.

[24] It is the policy and practice of the City of Jennings to inform debtors that, if they or their families pay their debt in full, they can be released from jail and have their cases terminated.  At any moment, the entire process can be ended by a monetary payment.  If a person can afford to make sufficient payments, the person will never have another court date set by the City of Jennings.  The termination of these cases is determined solely by the wealth of individuals.

214.    At the "payment docket," courtroom police staff instructs audience members that those paying more money will be called first.  The courtroom police staff calls a list of descending dollar amounts between $100 and $25 and instructs those paying each amount to line up when the number is called.  The officer informs the audience by shouting to the entire room that anyone who cannot pay at least $25 will be considered a "no pay."

215.    After the officer instructs audience members that if they cannot afford at least $25, they are not permitted to pay and will be classified as a "no pay," some audience members typically leave the building.

216.    The officer instructs the audience that repeated appearances without payment will result in the person being jailed.

217.    Those not making a payment or unable to come up with at least $25 are also told by the City clerk who collects payments that they "must" start paying.  Officers also inform audience members that they will check "no pay" people for warrants in other municipalities.

218.    As each dollar amount is called, large numbers of people rise from the pews and form lines against the wall of the courtroom, proceeding in assembly line fashion to see the officer, who hands them their file.  They are then directed to a cash window in the hallway next to the courtroom where they are told to pay the City clerk.  Those making significant payments are not required to attend any judicial proceeding, and the judge is often not in the room during the assembly line payment sessions.

219.    The City prosecutor and City judge do not conduct indigence or ability-to-pay hearings.  Regular observers of the City court have never once seen an indigence or ability to pay hearing conducted in the past decade.

220.    The City prosecutor and City judge conduct no meaningful individualized process prior to ordering people to make generic monthly payments.  Payment plans are set without any adversarial process and without any individualized inquiry into the circumstances of a debtor. Those jailed for unpaid debts (i.e. for not making their ordered payments) are not appointed an attorney, even though the City is represented by an experienced prosecutor.

221.    In addition to the difficulty of mounting constitutional and statutory arguments and defenses in the face of an experienced prosecutor, navigating the origin of the numerous fees and surcharges imposed by Jennings and determining whether they are even validly assessed by the City in any particular case is a complicated inquiry.  This inquiry involves the application of state law and procedure; local law and practice; multiple court files, accounting documents, and receipts over a period of years; and constitutional law to a person's lengthy case history.

222.    The vast majority of those jailed for violating the payment plan condition imposed by the City were not represented by an attorney on the underlying traffic or minor charge because of the City's policy and practice of not appointing counsel.

223.    The Plaintiffs and many other witnesses have observed numerous other impoverished people jailed by the City for non-payment of debts without a meaningful inquiry into their ability to pay, without the representation of counsel, and without the consideration of whether imprisonment serves legitimate state interests in light of available alternatives as required by federal and Missouri law.  The Plaintiffs and other witnesses have observed numerous other people and families who were told that they or their family member would be held in jail by the City unless and until they brought forward large sums of money to pay off debts supposedly owed for traffic tickets and subsequent surcharges.

224.    The City employs a materially different set of procedures for those people who retain private counsel.  It is and has been the policy and practice of the City of Jennings to remove existing arrest warrants and schedule new court dates for those debtors who retain a private lawyer. Unrepresented people are told that there is no way to clear their warrants unless they pay the City.

### iii.   The Deplorable Conditions in the Jennings Jail

225.    As described above, inmates jailed for non-payment are, as a matter of City policy and practice, kept in overcrowded cells with inmates strewn about the floor and tables.  The City deliberately ignores basic principles of hygiene, sanitation, medical and mental health care, and inmate safety.

226.    Inmates are denied toothbrushes, toothpaste, and soap; they are kept in cells that reek of visible excrement and surrounded by walls smeared with blood and mucus; they are kept in the same clothes for days and weeks without access to laundry; they huddle in frigid temperatures with a single thin blanket even as they beg guards for warm blankets; they develop illnesses and infections in open wounds that spread to other inmates; they sleep next to an open uncleansed toilet and shower space overgrown with mold; they endure weeks without being allowed to use the shower; women are not given adequate hygiene products for menstruation, and the lack of trash removal has on occasion forced women to leave bloody napkins in full view on the cell floor where inmates sleep; they are routinely denied vital medical care and prescription medication, even when their families beg to be allowed to bring medication to the jail; inmates with serious mental health issues are not provided mental health treatment or prescription medication that they need; they are provided food so insufficient and lacking in nutrition that inmates are forced to compete to perform demeaning janitorial labor for extra food rations and exercise; they suffer from dehydration because they are given water that smells and comes from a

rusty faucet connected to the top of the toilet; and they are deprived of books, legal materials, exercise, television, internet, or natural light.

227.   On March 22, 2013, an inmate unable to afford debt from traffic tickets hanged himself in the Jennings jail.  On October 6, 2014, another man hanged himself after being held in Jennings because he was not able to pay $500 for his release.

228.   Other inmates have been abused and physically beaten by jail staff as a result of a culture of unaccountability and abuse resulting from a lack of adequate training and supervision.

229.   These abuses and deprivations are accompanied by other pervasive humiliations. As described above, jail guards routinely taunt impoverished people when they are unable to pay for their release.

230.   When groups of inmates are brought to court, courtroom staff often walks down the hallway spraying Fabreze because the stench emanating from the inmates is unbearable.

231.   The totality of these conditions described by the Plaintiffs and by numerous witnesses amounts to unlawful punishment.  The conditions at the Jennings jail are deliberately designed to be as degrading and humiliating as possible in order to punish debtors for not paying their debts and to discourage them from missing payments to the City.  The purpose and effect is to coerce debtors to borrow money or use money otherwise needed for the basic necessities of life in order to pay the City to avoid being subjected to the dangerous and humiliating Jennings jail.

232.   The jail conditions created and perpetuated by the City of Jennings would be unconstitutional under the Eighth Amendment even were convicted prisoners treated with such callous disregard to basic health and safety.  The City forces these conditions on pretrial detainees and post-judgment debtors jailed long after monetary judgments and solely because of their inability to make monetary payments and not pursuant to any criminal sentence.

233.    The use of the Jennings jail and its deplorable conditions in discrete spurts of confinement followed by incrementally reducing the sums of cash required for release or granting release for free after several days has the purpose and effect of punishing people rather than achieving any other lawful goal.

### iv.  The City's Flawed and Unlawful Warrant Process

234.    It is and has been the policy and practice of the City to issue invalid arrest warrants and to apply arbitrary and illegal policies for the issuance and recalling of warrants.

235.    Among the policies and practices of the City of Jennings are the following:

a.  The City informs people that they can remove outstanding warrants simply by paying a sum of money but does not offer a way for the indigent to remove arrest warrants.

b.  The City allows for the removal of existing warrants without paying the City only if the person retains a lawyer.

c.  The City issues arrest warrants for the failure to make a payment by a certain date without probable cause to believe that the person had the ability to make a payment.

d.  When impoverished people appear in the courtroom, they are told by the judge, courtroom officers, City prosecutor, and City clerk that they will be jailed if they do not bring specific sums of money to the City on designated dates in the future.

e.  The City issues arrest warrants when people do not pay by certain designated dates even though the person did not fail to appear at any court appearance.

f.  The City issues arrest warrants for "failure to appear" at court dates for which the person had not been given adequate notice, such as when the City routinely fails to provide a valid summons or when the City moves a hearing to a new date and time without providing reasonable notice.  The City does not adequately ensure actual notice of changes in court dates and routinely issues arrest warrants even when it has no probable cause to believe that the elements of a "failure to appear" charge have been met, such as when the person did not intentionally fail to appear because the person was in the custody of another jurisdiction or was in the hospital.

g.  The City locks the courthouse doors, thereby preventing people who appear for court from entering, and then issues arrest warrants for people who were locked out of the building.

h.  After arrest pursuant to a warrant, the City either does not bring the person to court at all or delays presentment unnecessarily and for no legitimate purpose for days or weeks.

### C.    The Cycle of Debt and Jailing in Other Municipalities

236.    Like the other impoverished people stuck in this broken system, the Plaintiffs have been overwhelmed by the combination of multiplying fines, fees, costs, and surcharges from many different municipalities at once, as well as the cycle of repeated jailings and subsequent transfers to several different jails during each jailing, lost jobs, increased fees, and the inability to renew drivers' licenses because of unpaid tickets.  After scraping together cash from family and friends and borrowing money to pay Jennings, the Plaintiffs and other Class members would simply be jailed by another city.

237.    The hopelessness of trying to navigate this system for years without financial resources and without the assistance of a lawyer who understands the process—never knowing when they left the house if they would be arrested and always confronted with the powerlessness of being kept in jail indefinitely because of their poverty—fundamentally altered the lives of the Plaintiffs and continues to tear at the core of the community.

238.    The fear of having basic rights violated with no recourse is a daily fact of life for the Plaintiffs and thousands of others.  It is this despair that the Saint Louis County debtors' prison network cultivates that leads many impoverished people to avoid the system and some, sadly, to take their own lives while languishing in a jail cell.[25]

### Class Action Allegations

239.    The Plaintiffs bring this action on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

240.    A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown Class members can challenge the City's unlawful debt-collection scheme.

---

[25] At least four suicides or suicide attempts by people held because they were too poor to pay for their release have occurred in local jails just in the past five months.

241.    This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

242.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

243.    Plaintiffs propose two Classes: a Declaratory and Injunctive Class and a Damages Class.  The Declaratory and Injunctive Class is defined as:  All persons who currently owe or who will incur debts to the City of Jennings from fines, fees, costs, or surcharges arising from cases in the City court.

244.    The Damages Class is defined as: All persons who, from February 8, 2010, until the present, were held in jail by the City because of their non-payment of a monetary sum required by the City.

245.    The Damages Class contains one Subclass: the Jail Labor Subclass.  The Jail Labor Subclass is defined as: Those people who were kept in jail by the City for non-payment of debts and who were coerced into providing free labor to the City in the form of janitorial services because they were subjected to the City's policy of depriving inmates of sufficient food and exercise.

A.    **Numerosity.  Fed. R. Civ. P. 23(a)(1)**

246.    Over the past five years, thousands of people have owed and currently owe the City of Jennings money from old traffic tickets and other minor municipal offenses.  Pursuant to City policy and practice, thousands of people who have indicated that they are too poor to pay their debts in total have been placed on payment plans by the City.  All of these people are currently being threatened with arrest and jailing if they do not make the payments in the amount or frequency purportedly required by the City.

247.    The City has kept hundreds of people in its jail for non-payment in each of the past

five years.  The City retains, and is required by law to retain, records of these instances.

248.    The City followed and follows materially the same debt-collection policies, practices, and procedures to accomplish the jailing of the Class members.  For example, pursuant to the City's policy and practice, those kept in jail by the City for non-payment did not receive meaningful inquiries into their ability to pay as required by federal and Missouri law.  Pursuant to City policy, no determinations of indigence, ability to pay hearings, or evaluations of alternatives to incarceration were made, and the City provided none of the relevant state and federal protections for debtors.   Nor were those jailed by the City provided adequate counsel to represent them.

249.    Those who still owe the City debt payments or who will incur such debts will be subjected to the same ongoing policies and practices absent the relief sought in this Complaint.

**B.      Commonality.  Fed. R. Civ. P. 23(a)(2).**

250.    The relief sought is common to all members of the Injunctive and Damages Classes, and common questions of law and fact exist as to all members of the Classes.  The Plaintiffs seek relief concerning whether the City's policies, practices, and procedures violated their rights and relief mandating the City to change its policies, practices, and procedures so that the Plaintiffs' rights will be protected in the future.

251.    Among the most important, but not the only, common questions of fact are:

- Whether the City has a policy and practice of keeping people in its jail who owe money on old judgments unless and until they can pay a monetary sum;
- Whether the City has a policy and practice of incrementally lowering the amount required to buy a debtor's release from custody as the person sits in jail;
- Whether the City has a policy and practice of failing to conduct meaningful inquiries into the ability of a person to pay before jailing the person for non-payment;
- Whether the City provides notice to debtors that their ability to pay will be a relevant issue at the proceedings at which they are jailed or kept in jail and whether the City makes findings concerning ability to pay and alternatives to incarceration;
- Whether the City provides adequate legal representation to those jailed for unpaid debts in proceedings that result in their incarceration;
- Whether the City jail conditions are unsanitary and inhumane in the ways described in this

Complaint;

- Whether City employees and agents have a policy and practice of threatening debtors and families of debtors with incarceration for unpaid debts without informing them of their rights;
- Whether the City has a policy of issuing and executing warrants for the arrest of debtors despite lacking probable cause that they have committed any offense and without any notice or opportunity to be heard concerning their ability to pay or the validity of the debt.
- Whether the City has a policy of coercing inmates to perform free janitorial labor in exchange for increased food rations;
- Whether the City has a policy and practice of closing the courtroom to the public.

252.    Among the most important common question of law are:

- Whether keeping people in jail solely because they cannot afford to make a monetary payment is lawful;
- Whether people are entitled to a meaningful inquiry into their ability to pay before being jailed by the City for non-payment of debts;
- Whether people who cannot afford to pay the City are entitled to the consideration of alternatives to incarceration before being jailed for non-payment of debts;
- Whether people are entitled to adequate legal representation in debt-collection proceedings initiated and litigated by City prosecutors that result in their incarceration if they cannot afford an attorney;
- Whether the City can employ jail, threats of jail, and other harsh debt-collection measures (such as ordering payment of significant portions of a person's public assistance benefits) against debtors who cannot afford immediately to pay the City in full;
- Whether the City can arrest people based solely on their non-payment without any probable cause that they have committed any willful conduct or other offense and without notice and an opportunity to be heard concerning legal predicates for a valid detention, such as their ability to pay and the validity of the debt;
- Whether the City can, consistent with federal law, coerce free labor through the provision of insufficient food rations;
- Whether the inhumane and unsanitary conditions endured by the Plaintiffs and other Class members violate the Eighth and Fourteenth Amendments;
- Whether the City can, consistent with the First Amendment to the United States Constitution, close the City court proceedings from public view.

253.    These common legal and factual questions arise from one central scheme and set

of policies and practices: the City's enormously profitable traffic and ordinance debt collection

system.  The City operates this scheme openly and in materially the same manner every day, and

all of the ancillary factual questions about how that scheme operates are common to all members

of the Classes, as well as the resulting legal questions about whether that scheme is unlawful.  The

material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the constitutional relief that they seek.

### C.    Typicality.  Fed. R. Civ. P. 23(a)(3).

254.    The named Plaintiffs' claims are typical of the claims of the members of the Classes and Subclass respectively, and they have the same interests in this case as all other members of the Classes that they represent.  Each of them suffered injuries from the failure of the City to comply with the basic constitutional provisions detailed below.  The answer to whether the City's scheme of policies and practices is unconstitutional will determine the claims of the named Plaintiffs and every other Class member.

255.    If the named Plaintiffs succeed in their claims that the City's policies and practices concerning debt collection for fines, fees, costs, and surcharges violate the law in the ways alleged in each claim of the Complaint, then that ruling will likewise benefit every other member of the Injunctive and Damages Classes, as well as the Damages Subclasses.[26]

### D.    Adequacy.  Fed. R. Civ. P. 23(a)(4).

256.    The named Plaintiffs are adequate representatives of the Classes because they are members of the Classes and because their interests coincide with, and are not antagonistic to, those of the Classes.  There are no known conflicts of interest among Class members, all of whom have a similar interest in vindicating the constitutional rights to which they are entitled.

257.    Plaintiffs are represented by attorneys from Equal Justice Under Law,[27] who have

---

[26] The named Plaintiffs representing the Damages Class are Samantha Jenkins, Edward Brown, Keilee Fant, Byeon Wells, Meldon Moffit, Allison Nelson, and Herbert Nelson Jr.  The named Plaintiffs representing the Damages Class are Samantha Jenkins, Edward Brown, Keilee Fant, Byeon Wells, Meldon Moffit, Allison Nelson, Herbert Nelson Jr., and Tonya DeBerry.

[27] Equal Justice Under Law is a non-profit civil rights organization based in Washington, D.C.  The organization is funded in part by the Harvard Law School Public Service Venture Fund.

experience in litigating complex civil rights matters in federal court and extensive knowledge of both the details of the City's scheme and the relevant constitutional and statutory law.  Plaintiffs are also represented by attorneys from ArchCity Defenders who have extensive experience with the functioning of the entire municipal court system in the City of Jennings through their representation of numerous impoverished people in the City of Jennings.[28]  Plaintiffs are also represented by the Saint Louis University School of Law,[29] whose distinguished clinical professors and dedicated students have devoted enormous time and resources to studying the functioning of the municipal court system and the applicable federal and state law, as well as to representing impoverished people affected by the illegalities permeating the City's municipal scheme.

258.    The efforts of Plaintiffs' counsel have so far included extensive investigation over a period of months, including numerous interviews with witnesses, City employees, City jail inmates, families, attorneys practicing in the Jennings Municipal Court, community members, statewide experts in the functioning of Missouri municipal courts, and national experts in constitutional law, debt collection, bankruptcy law, criminal law, and forced labor.

259.    Counsel have also observed numerous courtroom hearings in the City of Jennings and in municipalities across the region in order to compile a detailed understanding of state law

---

Counsel from Equal Justice Under Law was recently lead counsel in a landmark federal civil rights class action lawsuit against the City of Montgomery for engaging in similar debtors' prison practices.  In that case, the United States District Court for the Middle District of Alabama issued a preliminary injunction condemning and forbidding the City of Montgomery's similar jailing of impoverished people with unpaid debts, and the case was successfully settled after the City of Montgomery agreed to compensate the Plaintiffs and to the entry of an injunction reforming its entire municipal debt-collection regime.

[28] ArchCity Defenders is a non-profit public interest law firm based in Saint Louis.  It has represented the poor and homeless in cases involving the City of Jennings for the past five years and is an expert on the ways in which Jennings's illegal practices and policies make and keep people poor.  ArchCity Defenders also published an extensive report detailing similar practices and policies in the cities of Bel-Ridge, Ferguson, and Florissant.  The report is available at www.archcitydefenders.org.

[29] Saint Louis University School of Law Clinics have been involved in representing the poor and homeless in municipal courts for many years and have extensive knowledge of and experience with the systemic constitutional violations pervading the City's scheme.  Further, the Clinic and its professors have extensive experience in class action lawsuits.

and practices as they relate to federal constitutional requirements. Counsel have studied the way that these systems function in other cities in order to investigate the wide array of options in practice for municipalities.

260.    As a result, counsel have devoted enormous time and resources to becoming intimately familiar with the City's scheme and with all of the relevant state and federal laws and procedures that can and should govern it.   Counsel has also developed relationships with many of the individuals and families most victimized by the City's practices.

261.    The interests of the members of the Class will be fairly and adequately protected by the Plaintiffs and their attorneys.

**E.     Rule 23(b)(2)**

262.    Class action status is appropriate because the City, through the policies, practices, and procedures that make up its traffic and ordinance debt-collection scheme, has acted and refused to act on grounds generally applicable to the Declaratory and Injunctive Class.  Thus, a declaration that people in the City cannot be held in jail solely because they cannot afford to make a monetary payment will apply to each Class member.  Similarly, a determination that Class members are entitled, as a matter of federal law, to a meaningful inquiry into their ability to pay and an evaluation of alternatives to incarceration before they are jailed by the City for non-payment will apply to each Class member.  The same applies to rulings on the other claims, including: that Class members are entitled to representation by counsel at proceedings initiated and litigated by City prosecutors in connection with which they are jailed; that the City cannot imprison Class members for debts and then coerce them into working for the City as jailed janitors; that the City cannot collect debts from Class members in a manner that violates and evades all of the relevant protections for other judgment debtors; that the jail conditions to which members of the class are

exposed are inhumane and unconstitutional; and that the City cannot issue and execute arrest warrants for traffic debtors without probable cause that they have committed an offense and without notice or a hearing prior to the deprivation of their liberty..

263.    Injunctive relief compelling the City to comply with these constitutional rights will similarly protect each member of the Class from being again subjected to the City's unlawful policies and practices with respect to the debts that they still owe and protect those who will incur such debts in the future from the same unconstitutional conduct.   Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

**F:     Rule 23(b)(3)**

264.    Class treatment under Rule 23(b)(3) is also appropriate because the common questions of law and fact overwhelmingly predominate in this case.   This case turns, for every Plaintiff, on what the City's policies and practices are and on whether those policies are lawful.

265.    The common questions of law and fact listed above are dispositive questions in the case of every member of the Classes and Subclasses.   The question of liability can therefore be determined on a class-wide basis.   Class-wide treatment of liability is a far superior method of determining the content and legality of the City's policies and practices than individual suits by hundreds or thousands of City residents.   The question of damages will also be driven by class-wide determinations, such as the policies, practices, and conditions at the City jail.   To the extent that individual damages will vary, they will vary depending in large part on the amount of time that a person was unlawfully jailed.   Determining damages for individual Class members can thus typically be handled in a ministerial fashion based on easily verifiable records of the length of unlawful incarceration.   If need be, individual hearings on Class-member specific damages based

on special circumstances can be held after Class-wide liability is determined—a method far more efficient than the wholesale litigation of hundreds or thousands of individual lawsuits.

266.    The Plaintiffs seek the following relief and hereby demand a jury in this cause for all matters so appropriate.

### Claims for Relief

**Count One:  Defendant City of Jennings Violated the Plaintiffs' Rights By Jailing Them Because They Could Not Afford To Pay the City.**

267.     Plaintiffs incorporate by reference the allegations in paragraphs 1-266.

268.    The Fourteenth Amendment's due process and equal protection clauses have long prohibited imprisoning a person for the failure to pay money owed to the government if that person is indigent and unable to pay.  Defendant violated Plaintiffs' rights by imprisoning Plaintiffs when they could not afford to pay the debts allegedly owed from traffic and other minor offenses. Defendant violated Plaintiffs' rights by imprisoning them, and by threatening to imprison them, without conducting any inquiry into their ability to pay and without conducting any inquiry into alternatives to imprisonment as required by the United States Constitution.  At any moment, a wealthier person in the Plaintiffs' position could have paid a sum of cash and been released from jail.  Defendant's policy and practice of keeping Plaintiffs in its jail unless and until they are able to pay arbitrarily determined and constantly-shifting sums of money violates the Fourteenth Amendment.

**Count Two: Defendant City of Jennings Violated Plaintiffs' Rights By Imprisoning Them Without Providing Adequate Counsel.**

269.    Plaintiffs incorporate by reference the allegations in paragraphs 1-268.

270.    Defendant violated Plaintiffs' right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution by imprisoning Plaintiffs

during proceedings initiated by City prosecutors at which Plaintiffs did not have the benefit of counsel and did not knowingly, intelligently, and voluntarily waive counsel.  The City's policy of not providing adequate counsel at hearings in which indigent people are ordered to be imprisoned in the City jail for unpaid debts, which are, in turn, based on payment plans arising from traffic and other violations at which the person was also unrepresented, violates the Sixth and Fourteenth Amendments to the United States Constitution.

**Count Three: Defendant City of Jennings' Use of Indefinite and Arbitrary Detention Violates Due Process**

271.    Plaintiffs incorporate by reference the allegations in paragraphs 1-270 above.

272.    The Due Process Clause of the Fourteenth Amendment prohibits the City from jailing the Plaintiffs indefinitely and without any meaningful legal process through which they can challenge their detention by keeping them confined in the Defendant's jail unless or until they could make arbitrarily determined cash payments.

**Count Four: The Deplorable Conditions in the Jennings Jail Violate Due Process and Constitute Impermissible Punishment**

273.    Plaintiffs incorporate by reference the allegations in paragraphs 1-272 above.

274.    The unsafe, unsanitary, inhumane, and dangerous conditions of confinement in the Jennings jail constitute impermissible punishment unrelated to serving any criminal judgment. Even if imposed after valid conviction, the conditions would constitute cruel and unusual treatment.  The deplorable and excessively harsh conditions pervasive in the Defendant's jail are unnecessary to accomplish any legitimate government objective and shock the conscience of any reasonable person concerned with human dignity and liberty.

**Count Five: Defendant City of Jennings' Scheme of Coercing Indigent Prisoners to Labor For Free in the City Jail in Order to Obtain Extra Food Violates the Thirteenth Amendment.**

275.    Plaintiffs incorporate by reference the allegations in paragraphs 1-274 above.

276.    The City unlawfully held the Plaintiffs and Class members in jail because of their inability to make a monetary payment to the City.  The City provided insufficient food and overcrowded and disgusting cells, coercing inmates to volunteer to perform janitorial work in order to secure extra necessities, such as additional food and time outside of the congested cells.  The coercion based on inadequate food and constitutionally deficient living conditions forced inmates, in their desperation, to labor without compensation and not pursuant to any criminal conviction.

277.    The Plaintiffs allegedly owed the City a solely monetary debt for the fines, fees, and costs from civil judgments for traffic tickets and other minor municipal offenses.  Because the Plaintiffs were not imprisoned or sentenced to involuntary servitude as punishment for any crime, the Thirteenth Amendment bars the coerced use of their labor to save the City employment and janitorial costs.  The City's conduct also violates federal statutory law, including 18 U.S.C. § 1589 (forced labor under threat of physical restraint or abuse of process), § 1593A (benefitting from peonage); and § 1595 (providing a civil remedy).

**Count Six: Defendant City of Jennings' Use of Jail and Threats of Jail To Collect Debts Owed to the City Violates Equal Protection Because It Imposes Unduly Harsh and Punitive Restrictions On Debtors Whose Creditor Is the Government Compared To Those Who Owe Money to Private Creditors.**

278.    Plaintiffs incorporate by reference the allegations in paragraphs 1-277 above.

279.    The United States Supreme Court has held that, when governments seek to recoup costs from indigent defendants, they may not take advantage of their position to impose unduly restrictive methods of collection solely because the debt is owed to the government and not to a private creditor.  Not only does the City place indigent people on generic and overly onerous payment plans lasting years or decades when the cases of wealthier people would be closed, but by imposing imprisonment, repeated threats of imprisonment, indeterminate "payment dockets"

58

for many years, extra and invalid fees and surcharges, and other restrictions on Plaintiffs, the City

takes advantage of its control over the machinery of the City jail and police systems to deny debtors

the statutory protections that every other Missouri debtor may invoke against a private creditor.

Many people like the Plaintiffs owing money to the City of Jennings have to borrow money, ration

public benefits, and go further into debt in order to pay off the City of Jennings because other non-

government creditors are not permitted to jail them, threaten to jail them, or compel their repeated

appearances for years for non-payment of debt.   This coercive policy and practice constitutes

invidious discrimination and violates the fundamental principles of equal protection of the laws.

**Count Seven: Defendant City of Jennings's Policy and Practice of Issuing and Serving Invalid Warrants, Including Those Solely Based on Nonpayment of Monetary Debt, Violates the Fourth and Fourteenth Amendments.**

280.   Plaintiffs incorporate by reference the allegations in paragraphs 1-279 above.

281.   The City's policy and practice is to issue and serve arrest warrants against those

who have not paid their debt from old judgments in traffic and other minor cases.   These warrants

are sought, issued, and served without any inquiry into the person's ability to pay even when the

City has prior knowledge that the person is impoverished and unable to pay the debts or possesses

other valid defenses.   These warrants are regularly sought, issued, and served without any finding

of probable cause that the person has committed the elements of any offense.   The City chooses to

pursue warrants instead of issuing summons even when it has spoken to people on the phone or in

person and has the opportunity to notify them to appear in court.   The City enforces a policy of

allowing wealthy residents or residents who can afford to hire an attorney to remove their warrants

but refusing to remove warrant.   Moreover, the City's policy and practice of not presenting

arrestees in court or unreasonably delaying presentment for days or weeks for no legitimate reason

is unlawful.  These practices violate the Fourth and Fourteenth Amendments and result in a deprivation of fundamental liberty without adequate due process.

**Count Eight: Defendant City of Jennings's Policy and Practice of Locking the Courtroom's Doors, Closing Judicial Proceedings to the Public During Proceedings Involving City Inmates, and Conducting Judicial Proceedings Through Private Bench Conference Violates the First and Fourteenth Amendments.**

282.    Plaintiffs incorporate by reference the allegations in paragraphs 1-281 above.

283.    Defendant's blanket policy of courtroom closure during cases involving inmates from the Jennings jail violates the Plaintiffs' and the public's First Amendment Right of Access to public judicial proceedings.  Moreover, the Defendant's policy and practice of holding presumptively public judicial proceedings through private bench conferences—without making on-the-record findings of the necessity of closure prior to shielding presumptively public judicial proceedings from public access—effectively renders those proceedings secret in violation of the First and Fourteenth Amendments and federal common law.  Defendants' policy and practice of conducting municipal court proceedings in a way that prevents the public from accessing and hearing what transpires in those proceedings, and without subsequently providing transcripts or other means of recording those proceedings, violates their constitutional obligation to make judicial proceedings in criminal cases open to the public.

### Request for Relief

WHEREFORE, Plaintiffs request that this Court issue the following relief:

a.  A declaratory judgment that Defendant violates Plaintiffs' Fourteenth Amendment due process and equal protection rights by imprisoning them because they cannot afford to pay the City and by imprisoning them without conducting any meaningful inquiry into their ability to pay or into any alternatives to incarceration;

b.  A declaratory judgment that Defendant violates Plaintiffs' rights under the Sixth and Fourteenth Amendments by imprisoning them without appointing adequate counsel at the proceedings that led to their incarceration;

c.  A declaratory judgment that Defendant violates Plaintiffs' rights by holding them indefinitely and arbitrarily in jail independent of any valid legal process;

d. A declaratory judgment that Defendant violates Plaintiffs' rights by subjecting them to unconstitutional jail conditions;

e. A declaratory judgment that Defendant violates Plaintiffs' constitutional and statutory rights by coercing them into performing labor in its jail in order to work off their debt;

f. A declaratory judgment that Defendant violates Plaintiffs' equal protection rights by imposing harsh debt collection measures not imposed on debtors whose creditors are private entities;

g. A declaratory judgment that Defendant violates Plaintiffs' Fourth and Fourteenth Amendment rights by issuing and serving arrest warrants without probable cause to believe that the elements of an offense had been committed, with unreasonable delay prior to presentment, and without providing pre-deprivation of liberty process where such process is easily available to the City;

h. An order and judgment permanently enjoining Defendant from enforcing the above-described unconstitutional policies and practices against Plaintiffs;

i. A judgment compensating the Plaintiffs for the damages that they suffered as a result of the City's unconstitutional and unlawful conduct;

j. An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 18 U.S.C. § 1595, and any other relief this Court deems just and proper.


Respectfully submitted,


_/s/ Alec Karakatsanis_____
Alec Karakatsanis (E.D.Mo. Bar No. 999294DC)

Equal Justice Under Law
916 G Street, NW Suite 701
Washington, DC 20001
(202)-681-2409
alec@equaljusticeunderlaw.org


_/s/ Thomas B. Harvey_____
Thomas B. Harvey (MBE #61734)

_/s/ Michael-John Voss_____
Michael-John Voss (MBE #61742)

ArchCity Defenders
812 N. Collins Alley
Saint Louis, MO 63102
855-724-2489


_/s/ John J. Ammann_____

John J. Ammann (MBE #34308)

_/s/ Stephen Hanlon_____
Stephen Hanlon (MBE #19340)

_/s/ Brendan Roediger_____
Brendan Roediger (E.D.Mo. Bar No. IL6287213)

Saint Louis University School of Law
100 N. Tucker Blvd.
Saint Louis, MO 63101-1930
314-977-2778


*Attorneys for Plaintiffs*